# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARSHA SILVER HEIT** <br><br> v. <br><br> **PENN DENTAL MEDICINE, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, DANA T. GRAVES, D.D.S., DENIS F. KINANE, B.D.S.** | **CIVIL ACTION** <br><br> **NO. 16-2929** |

## MEMORANDUM

Baylson, J.                                                                                                                 November 29 , 2017

## I. Introduction

In 2015, Plaintiff Marsha Silver Heit was terminated from her position as an administrative coordinator at the University of Pennsylvania Dental School. She subsequently filed this action alleging age discrimination, sex discrimination, religious discrimination, hostile work environment, retaliatory discharge, and disability discrimination in violation of the Age Discrimination in Employment Act, the Pennsylvania Human Relations Act, Title VII, and the Americans with Disabilities Act against Defendants Penn Dental Medicine, Trustees of the University of Pennsylvania, Dana Graves and Denis Kinane (Compl., ECF 1). At the close of discovery, Defendants moved for summary judgment (Def.'s Mot. for Summ. J., ECF 85).

## II. Procedural History

Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Council (PHRC) on December 14, 2015. The EEOC issued a right-to-sue letter on March 9, 2016. (Ex. A to Compl., ECF 1). The PHRC sent Plaintiff a right-to-sue letter on May 2, 2016. (Ex. B to Compl., ECF 1).

Plaintiff filed this action on June 13, 2016. (Compl., ECF 1). The complaint initially alleged four counts: age discrimination in violation of the Pennsylvania Human Rights Act and

Age Discrimination in Employment Act (Counts I and II); discrimination on the basis of sex and religion, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Count III); and a violation of the Americans with Disabilities Act (Count IV). (Id.). Plaintiff subsequently filed an "amendment" to the Complaint spelling out the retaliation claim more fully, which was designated as Count V. (Am. Compl. Count V, ECF 31).

A contentious discovery period ensued, during which Plaintiff unsuccessfully tried several times to be permitted to take the deposition of the former provost of the University of Pennsylvania, Vincent Price. (Order denying discovery, ECF 67).

On August 30, 2017, Defendants moved for summary judgment. (Def.'s Mot. for Summ. J., ECF 85). Plaintiff's initial response in opposition to Defendants' motion for summary judgment did not conform to this Court's practice rules because it lacked a counterstatement of material facts in numbered paragraphs. (Pl.'s Opp. to Def.'s Mot. for Summ. J., ECF 90). This Court subsequently entered an order requesting that Plaintiff submit a separate document admitting or denying each of Defendants' facts, with record citations supporting any denial, and permitting her to file a separate statement of additional facts in numbered paragraphs warranting denial of summary judgment. (Order, ECF 92). On October 11, 2017, Plaintiff submitted a counterstatement of material facts in which she responded, paragraph by paragraph, with admissions or denials of Defendants' material facts, which included record citations as to some, but not all, of defendants' facts. (Pl.'s Response to Defs.' SOF, ECF 97). Plaintiff did not submit a separate statement of additional facts.

On October 12, 2017, Plaintiff filed an "Emergency Motion for Discovery" pursuant to Fed. R. Civ. P. 56(d)(2), which was limited to the issue of whether this Court would grant her

2

permission to take the deposition of the former provost of Penn. (Pl.'s Emergency Mot. for Discovery, ECF 99). The motions are now ripe for decision.

## III. Factual Background

The following facts are undisputed.

### A. Plaintiff's History at Penn

Beginning on November 1, 2007, Plaintiff worked as a part-time academic coordinator in the Periodontics Department at Penn Dental. (Compl. ¶ 15). Effective March 14, 2008, she began working full-time in the Periodontics Department, reporting to then-Department Chair Dr. Joseph Fiorellini. (Offer Letter, Ex. 2 to Def.'s Mot for Summ. J., ECF 85). Dr. Fiorellini reported to the dean of Penn Dental, Defendant Denis Kinane. (Fiorellini Dep. 7:12-14, ECF 101). Dean Kinane testified that he had regular, monthly, one-one-one meetings with the then-provost of the University of Pennsylvania, Vincent Price. (Kinane Dep. 15:13-19, Ex. 12 to Def.'s Mot. for Summ. J.).

Plaintiff worked in this position until she was terminated on November 30, 2015. (Termination Letter, Ex. 56 to Def.'s Mot for Summ. J.). Plaintiff was required to submit weekly timesheets showing the hours she worked on each day of the week. (Farero Decl. ¶ 25, Ex. 15 to Def.'s Mot for Summ. J.). Plaintiff, a Jewish woman, was 48 years old at the time of her discharge. (Compl. ¶ 13).

### B. Plaintiff's testimony about 2010-13 incidents involving Dean Denis Kinane

According to Plaintiff's testimony, during the period 2010-13, while she was working for Dr. Fiorellini, Plaintiff experienced or heard about several incidents involving Dean Kinane.

Plaintiff testified that that in 2012 or 2013, she heard Dean Kinane refer to a female colleague "waddling like a duck." (Heit Dep. 83:10-84:21, ECF 97-1). Plaintiff testified that she observed Dean Kinane, who was married, dancing closely with another married colleague at

a wedding in 2010 or 2011, which she deemed inappropriate, but that the encounter did not appear to be non-consensual. (Heit Dep. 87:4-89:8).

Plaintiff testified that the employee who was the subject of the "waddling" comment also told her that Dean Kinane had taken food away from her on one occasion. (Heit Dep. 84:4-7).

Plaintiff testified that a colleague, whose parents were Holocaust survivors, told her that Dr. Kinane had referred to his parents' having been sent to "Camp Auschwitz." (Heit Dep. 97:7-15). According to Plaintiff's testimony, Dean Kinane made remarks to other employees regarding Jews, "years" before her termination, which those employees then recounted to her. (Heit Dep. 278:1-279:3). Another Penn Dental employee testified that Kinane "would make comments about how all of our alumni from a certain age are Italians and Jews" and the school needed "a Jew to work with" Jewish alumni. (M.G. Dep. 29:4-7).[1]

Plaintiff further testified that in 2013, a student approached her to report a remark that Dean Kinane had made to her boyfriend to the effect that he "was lucky to have somebody like that to go to bed" with; Plaintiff reported this encounter to her boss, Dr. Fiorellini. (Heit Dep. 99:16-101:22). Dr. Fiorellini testified that he reported the incident to Penn's general counsel, but was unsure what happened subsequently. (Fiorellini Dep. 29:19-32:17).

According to Plaintiff's testimony, a staff dentist informed Plaintiff about an incident involving another dental student, who was, as Plaintiff put it, "in some form sexually harassed by Dean Kinane" (Heit Dep. 303:6-7, 323:6-23). She testified that told a law professor about this incident by phone, and claims to have called someone at "central HR," but could not recall details of the latter conversation. (Heit. Dep. 92:9-94:18).

---

[1] In her counterstatement of facts, Plaintiff asserts that she "heard Kinane directly refer to Jews," but does not provide any record evidence for this assertion, and the Court can find none. (Pl.'s SOF ¶ 11).

4

Plaintiff became aware of a third alleged incident involving another female Penn employee. At his deposition, Dean Kinane admitted to having touched the female employee in his office. (Kinane Dep. 13:17-24). Dean Kinane testified that former provost Price told him at one of their regular meetings that "this was not appropriate." (Kinane Dep. 15:6).

Plaintiff testified that all of these incidents occurred in 2012 or 2013. (Heit Dep. 111:15-22). Most of Plaintiff's testimony regarding all supposed incidents of sexual harassment, and all of her testimony regarding anti-Semitism, is hearsay for which she lacks personal knowledge. Although Plaintiff testified that Dean Kinane made her cry on one occasion when she did not know the answer to a question, she did not testify to any other inappropriate behavior, or any hostility, to her. (Heit Dep. 302:20-303:1).

**C. Events leading up to Plaintiff's termination**

Until July 1, 2015, Plaintiff reported to Dr. Fiorellini, Chair of the Periodontics Department, with whom, she testified, she had a good relationship. (Heit Dep. 74:19-75:14). When Dr. Fiorellini left for sabbatical, Defendant Dr. Dana Graves took over as interim chair of the department, and Heit began reporting to him. (Graves Decl. ¶¶ 9-10, Ex. 20 to Def.'s Mot. for Summ. J., ECF 85). Both Plaintiff and Dr. Graves described a difficult relationship. Dr. Graves stated in his declaration that "[w]ithin the first month that I was Interim Chair and Ms. Heit reported to me, I noticed that Ms. Heit struggled to complete her tasks and responsibilities in a timely and efficient manner without mistakes or need for correction." (Graves Decl. ¶ 12). Plaintiff testified that Dr. Graves was "argumentative" and "expected more than one person could possibly do." (Heit Dep. 76:19-20). During the summer of 2015, Plaintiff also provided administrative support to Dr. Panagiota Stathopoulou, another faculty member. (Stathopoulou Decl. ¶ 8, Ex. 6 to Def.'s Mot for Summ. J).

On July 14, 2015, Plaintiff filed paperwork requesting intermittent FMLA leave for the period from August 1 to November 1, 2015, which was granted. (FMLA Request Form, Ex. 30 to Def.'s Mot. for Summ. J.). Plaintiff checked off boxes for "Serious health condition that makes me unable to work" and for "Intermittent Leave" but did not specify what that condition was on the form. (Id.). At her deposition, Plaintiff testified that she sought FMLA leave for depression and anxiety, which she said was "[c]aused by the workplace," and that she was so anxious about the work environment that she drove to the office in tears "almost every day" for the last two years she worked at Penn Dental. (Heit Dep. 82: 13-14, 219:10, 305:5-8). However, she denied that increased demands at work or pressure from supervisors had made her symptoms worsen prior to her requesting FMLA leave. (Heit Dep. 83:1-7). She had long been treated for minor depression, discussed work-related anxiety with her counselor, and took antidepressants and anti-anxiety medication. (Heit Dep. 144:14-154:13). It is undisputed that Dr. Graves, Dr. Stathopoulou, and Mr. Farero did not know why she requested FMLA leave. (Def.'s Reply to Pl.'s Response to Def.'s Statement of Facts ¶ 49, ECF 104-2; Graves Decl. ¶ 16; Farero Decl. ¶ 14; Stathopoulou Decl. ¶ 17).

In summer 2015, at about the time Plaintiff began taking intermittent FMLA leave, Defendants decided to provide Plaintiff with additional support. Plaintiff asserts that she initiated the request. (Graves Decl. ¶¶ 15-16; Heit Dep. 205:23-206:1). Plaintiff, Dr. Graves, Dr. Stathopoulou, and the HR Director, Tony Farero, met and it was decided that Tory O'Neill, an administrative assistant in another department at Penn Dental who had worked successfully for Dr. Stathopoulou in the past, would take on these duties. (Stathopoulou Decl. ¶ 18; Heit Dep. 205:20-208:12). When Plaintiff was taking an FMLA day, Ms. O'Neill, who was substantially younger than Plaintiff, would fill in. (Stathopoulou Decl. ¶ 18; Heit Dep. 205:9-18).

On Monday, November 16, 2015, Plaintiff stayed home sick from work. (Heit Dep. 26:20-21). Dr. Graves was out of town that day at a conference, and stated in his declaration that he signed Plaintiff's weekly timesheet after his return. (Graves Decl. ¶¶ 26-27). Plaintiff's timesheet for that week, which bore her signature and was dated 11/18/15, stated that she had been in the office for eight hours on Monday, which would have been November 16. (Timesheet, Ex. 48 to Def.'s Mot for Summ. J.)

According to Debra Duffy, an employee in the Penn Dental Fiscal Operations Department, employees who are required to fill out timesheets must submit manual timesheets each Thursday for that work week. (Duffy Decl. ¶ 6-7, Ex. 57 to Def.'s Mot for Summ. J.). Although Plaintiff initially testified that she filled out timesheets each Thursday for the following week—and she therefore could not have predicted that she would be out sick—when cross-examined about the date of her timesheet, she testified that she "made a clerical error" and that "maybe [she] got the date wrong." (Heit Dep. 28:5-16). At her deposition, she admitted that the timesheet bore her signature, but denied postdating it. (Heit Dep. 28:3-17).

Upon suspicion that she might not have been in the office, Mr. Farero initiated an investigation, which confirmed that she was not actually in the office on Monday, November 16, 2015. (Farero Decl. ¶¶ 25-29). On November 20, 2015, Mr. Farero confronted Plaintiff about the timesheet in question, and informed her that conduct could be found to be falsifying records, a fireable offense. (Farero Decl. ¶ 30). Plaintiff testified that this conversation was the first time that she realized that her time sheet was incorrect. (Heit Dep. 39:7).

On November 24, 2015, Plaintiff contacted Ms. Duffy to ask how she and Dr. Graves could correct her timesheet, and on November 27, 2015 wrote a letter to Dr. Graves requesting to keep her job. (Email, Ex. 53 to Def.'s Mot. for Summ. J.; Letter to Dr. Graves, Ex. 55 to Def.'s

7

Mot. for Summ. J.). Nevertheless, Mr. Farero and Dr. Graves met with Plaintiff on November 30, 2015 to inform her that she was terminated effective December 1, 2015, and handed her a letter, signed by Dr. Graves, to that effect. (Termination Letter, Ex. 56 to Def.'s Mot. for Summ. J). In his declaration, Dr. Graves stated that he made the decision to terminate Plaintiff "based solely on Ms. Heit's clear violation of Penn policy and her prior poor performance" and did not take into account her "age, gender, religion, or the fact that she had previously taken FMLA leave." (Graves Decl. ¶¶ 43-44). Ms. O'Neill took over Plaintiff's responsibilities after her termination. (Graves Decl. ¶ 47; Heit Dep. 205: 9-11).

Dean Kinane testified that he was "not clear about the circumstances related to" Plaintiff's termination in 2015, and heard about it only after the fact. (Kinane Dep. 47:14-48:10). He also testified that he was not aware, prior to her termination, that Plaintiff had made any allegations of inappropriate sexual relationships or disparate treatment based on age, race or religion. (Kinane Dep. 49:19-50:8). The former provost of Penn, Vincent Price, submitted a declaration in which he averred that he had no knowledge of Plaintiff or the circumstances of her dismissal. (Price Decl., ECF 65-1).

**D. Disputed facts**

Plaintiff principally disputes the reason for her termination.[2] Without any record evidence, she constructs a theory whereby Dean Kinane, working through Dr. Graves, orchestrated her firing in retaliation for her making complaints. She claims that these complaints were passed along to former provost Vincent Price. (Pl.'s Opp. to Def.'s Mot. to Summ. J., ECF

---

[2] Defendants allege that in spring 2015, Plaintiff was investigated for receiving free dental care. Plaintiff admitted that shortly after the investigation, she referred the case of two other dentists, whom she believed to be working only part-time but were receiving full-time benefits, to a third-party provider called Ethics Point. (SOF ¶¶ 23-32). However, Plaintiff argues that this issue is not relevant to the claims in her complaint, and the Court agrees.

90 at 2). She asserts that Dean Kinane waited until Dr. Fiorellini was on sabbatical to terminate her. (Id. at 14).

Dean Kinane disputed the particulars of incidents that Plaintiff testified to having heard about. For example, at his deposition, he denied having made an inappropriate comment to a Penn Dental student's boyfriend at graduation. (Kinane Dep. 62:9-13). He also recalled touching another student's shoulders, when Plaintiff testified that she heard that he pulled the student onto his lap. (Kinane Dep. 13:22, Heit Dep. 113:3-7). However, these factual disputes are not issues of material fact as discussed below.

With respect to the timesheet that led to her firing, she alleges that Dr. Graves' signature on the timesheet prior to the investigation creates an inference of pretext: if he signed off on the timesheet, for which she was later fired, the firing must necessarily have been pretextual. Without citing to relevant record evidence, she dismisses any allegation by Defendants of dissatisfaction with her performance as "irrelevant" or "disputed." (SOF ¶¶ 55-60). She also testified in her deposition that when Mr. Farero brought the issue of the timesheet to her attention on November 20, 2015, he told her that the timesheet investigation was "retribution… for the initial complaints against Dean Kinane." (Heit Dep. 18:13-22). Mr. Farero, who was not deposed, stated in his declaration that at the time of Plaintiff's dismissal, he was "not aware of any complaints or reports made by her regarding inappropriate behavior by Dean Kinane, discrimination, harassment, retaliation, or any perceived hostile work environment at Penn Dental Medicine," and did not mention this alleged comment. (Farero Decl. ¶ 43).

**IV. Legal Standard**

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. Summary judgment is appropriate if the non-moving party fails to rebut the motion by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

**V.     Discussion**

On all counts, Defendants have done exactly what Celotex requires: they have pointed out the absence of evidence to support Plaintiff's claims—apart, of course, from her own suspicions and allegations regarding her termination. None of the factual disputes actually relates to the reasons for her termination, and Plaintiff has therefore shown no genuine issue of material fact for trial.

**A. Age Discrimination Claims**

The Age Discrimination in Employment Act of 1967 (ADEA) forbids employers from discharging employees because of their age. 29 U.S.C. § 623(a)(1). Only individuals over 40 may claim the protection of the ADEA. Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 69 (3d Cir. 2017). To establish a claim for disparate treatment under the ADEA, a plaintiff "must

prove that age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009). The Third Circuit employs a "slightly modified" version of the McDonnell Douglas burden-shifting framework in ADEA cases. Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). Age discrimination is also prohibited under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955(a). The same legal standard applies to both PHRA and ADEA claims, and courts sometimes consider them together. Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

To make out a prima facie case of age discrimination, a plaintiff must show "first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009). The burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action. Id. If the defendant does so, the burden returns to the plaintiff to demonstrate pretext. Id. at 690.

Plaintiff, who was over 40 at the time of her dismissal and evidently performed her job to her previous supervisor's satisfaction for some years, has easily satisfied the first three elements of her prima facie case. It is undisputed that she suffered an adverse employment action by virtue of being fired, and that Ms. O'Neill, Plaintiff's replacement, is substantially younger than Plaintiff.

Defendants have established a non-discriminatory reason for Plaintiff's dismissal. Thus, the burden shifts to Plaintiff to show that her termination was pretextual. As with her other claims, Plaintiff's case founders on the issue of pretext. She has pointed to no evidence

11

whatsoever showing that her age was the but-for cause of her termination. See Gross, 557 U.S. at 176. She also ignores Ms. O'Neill's role prior to her termination. While Plaintiff was taking intermittent FMLA leave, Ms. O'Neill would fill in, and would therefore have been an eminently logical choice, whatever her age, to replace Plaintiff after her departure. Plaintiff's age discrimination claim therefore fails.

### B. Title VII Claims

#### 1. Disparate treatment

Title VII of the Civil Rights Act of 1964 forbids employers from "discharg[ing] any individual" on the basis of sex or religion. 42 U.S.C.A. § 2000e-2 (a)(1). Plaintiff alleges that she was discharged "due to discriminatory feelings against her religion (Judaism) and her sex (female)." (Compl. ¶ 57). The McDonnell Douglas burden-shifting framework applies. Where, as here, the discharge is alleged to be pretextual, a plaintiff seeking relief under Title VII must first make out a prima facie case: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). Finally, the burden returns to the plaintiff to demonstrate pretext. Id.

Plaintiff is a Jewish woman who evidently performed her job to her previous supervisor's satisfaction for some years, and who was fired in 2015. Although she has satisfied the first three of the four elements, she has not pointed to any evidence creating an inference that the decision to terminate her was discriminatory, which it was her obligation to produce. Sarullo v. U.S.

Postal Serv., 352 F.3d 789, 799 (3d Cir. 2003). Plaintiff testified that Dr. Graves never said anything to her that was "racist, sexist or bigoted." (Heit Dep. 79:3-5). She likewise testified that she did not believe Mr. Farero had ever discriminated against her. (Heit Dep. 113:4-6). Whether or not Dean Kinane harbored any such biases, no evidence, apart from Plaintiff's own speculation, connects him to the decision to terminate her employment; Dean Kinane testified that he "wasn't prepared for" Plaintiff's termination and was told about Plaintiff's dismissal only after the fact. (Kinane Dep. 48:7-13).

Even had she been able to make out a prima facie case, she has not produced any evidence to rebut Defendants' claim that she was actually fired for poor performance and submitting a time sheet that showed hours she did not work, or to show that that Penn's ostensible reasons for firing her were pretext for religious or sex discrimination. Assertions of pretext and denials of the veracity of an employer's non-discriminatory justification for termination, without countervailing evidence, are not sufficient to defeat summary judgment. Sarullo v. U.S. Postal Serv., 352 F.3d at 800.

### 2. Retaliation

The anti-retaliation provision of Title VII also forbids discrimination against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.

Where a plaintiff seeks to prove retaliation through indirect evidence, the McDonnell Douglas burden-shifting framework applies. Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017). In order to make out a prima facie case, "a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and

(3) there was a causal connection between the participation in the protected activity and the adverse action." Id. The burden then shifts to the defendant to articulate a legitimate reason for the employment action; once an employer does so, the burden returns to the plaintiff to prove pretext. Id.

Both formal and informal complaints of discrimination or harassment constitute protected activity. Speed v. WES Health Sys., 93 F. Supp. 3d 351, 356 (E.D. Pa. 2015). Thus, Plaintiff's reports of incidents involving Dean Kinane to her supervisor, Dr. Fiorellini, and to "central HR" constitute protected activity.[3] However, she lacks any evidence showing any causal connection between the complaints made in 2012-13 and her dismissal in late 2015. Dean Kinane testified, and Mr. Farero stated in his declaration, that they were unaware that she had made complaints regarding discrimination or Dean Kinane's conduct. (Kinane Dep. 49:19-50:8; Farero Decl. ¶ 43). Dr. Graves did not testify to knowledge of complaints made by Plaintiff. All that remains is her testimony that Mr. Farero told her that her discharge was retaliatory, which, as hearsay, does not allow her to survive summary judgment on this ground. Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment"). Her retaliation claim therefore fails.

**3. Hostile Work Environment**

Title VII also allows plaintiffs to proceed on a theory of hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993). To make out a prima facie claim for hostile work environment on the basis of sex, a plaintiff "must establish 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive,

---

[3] Her 2015 reports to Ethics Point regarding suspected improper benefits receipt by other employees did not constitute complaints of any activity prohibited by Title VII, and are therefore irrelevant.

3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). Hostile work environment claims based on religion are subject to a comparable test. Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Mandel, 706 F.3d at 168 (quoting Harris, 510 U.S. at 23). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)).

### a. Intentional Discrimination

Plaintiff has not shown that she suffered intentional discrimination because of her sex or religion. At best, she has shown that Dean Kinane made a number of insensitive comments, most of which were alleged to have occurred outside her presence and all of which were directed at others, and that he behaved inappropriately toward other women two or three years before she was fired. In the Third Circuit, a plaintiff cannot "meet the first element of the hostile work environment claim under Title VII…*solely* by pointing to comments that were directed at other individuals." Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005). However, such comments may elucidate whether facially neutral conduct was motivated by discrimination. Id. at 264. Plaintiff's deposition testimony is telling:

> Q. While you were employed at Penn Dental, did Dean Kinane ever say anything to you that was discriminatory, sexist, racist or bigoted?
> A. He said -- he made reference to a colleague about her -- her weight and that she was waddling like a duck. Beyond that I don't recall specifics.
> Q. Okay. So, the only specific instance you recall is the reference to a colleague waddling like a duck?
> A. Uh-huh….
> Q. Tell me about this. When did this occur?
> A. Oh, I -- I don't -- I honestly don't remember. I want to -- maybe 2013 or 2012.

(Heit Dep. 83:10-84:2). Later in her deposition, she testified that she observed Dean Kinane dancing closely with a colleague at a wedding, which she did not perceive as non-consensual:

> Q. And when you say they were dancing inappropriately, did it appear that it was Dean Kinane was forcing himself on her or --
> A. No.· They were groping each other.
> Q. So, it was consensual conduct in your mind?
> A. I didn't consider it anything. I considered it inappropriate….
> Q. By inappropriate do you mean morally inappropriate?
> A. I mean it was -- it was -- it was inappropriate for two people in those positions, particularly the dean, to be behaving that way.

(Heit Dep. 88:12-89:7).

The incidents identified by Plaintiff, most of which she heard about from others and none of which was directed at Plaintiff herself, do not amount to discrimination on the basis of sex or religion sufficient to support a hostile work environment claim, which thus fails the very first prong of the relevant legal test.

### b. Severe and pervasive

Defendants also argue that the supposed discrimination, which constituted at most some seven or eight incidents over the period 2010-15—and most of which she did not witness—was not severe and pervasive. The Supreme Court has made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment"; sporadic incidents directed at others, most of which Plaintiff did not herself witness, simply will not suffice. Faragher v. City of Boca Raton, 524 U.S. at 788.

**E. ADA Claims**

The Americans with Disabilities Act (ADA) makes it unlawful for employers to discriminate against employees "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112 (a). A disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include working. 42 U.S.C. § 12102(2)(A). In 2008, Congress passed the ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008), "with the stated goal of ensuring that '[t]he definition of disability ... be construed in favor of broad coverage.'" Adair v. City of Muskogee, 823 F.3d 1297, 1305 (10th Cir. 2016) (quoting Pub. L. No. 110–325, § 2(a)(1)).

At various points in this action, Plaintiff has alleged different purported disabilities. In her Complaint, she alleged "disabling back pain for which she had previously taken an approved leave of absence." (Compl. ¶ 65). At her deposition, she testified that she had sought FMLA leave for anxiety and depression. (Heit Dep. 82:13-14). Plaintiff seeks to employ the prior FMLA leave as the basis for a disability discrimination claim under the ADA, but does not pursue an independent FMLA retaliation claim.

Where a plaintiff does not allege direct evidence of disability discrimination, a burden shifting regime applies. Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 668 (3d Cir. 1999). A prima facie case requires a plaintiff to show "'(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'" Alston v. Park Pleasant,

Inc., 679 F. App'x 169, 171 (3d Cir. 2017) (quoting Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)). As with so many other burden-shifting regimes, if a plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action, and subsequently returns to the plaintiff to prove pretext. Walton, 168 F.3d at 668.

The parties first debate whether Plaintiff is a disabled person for ADA purposes. Keeping in mind the intention of the ADA Amendments Act to provide expansive coverage, the Court finds that Plaintiff's testimony about taking anti-anxiety medication and seeing a counselor for anxiety (and discussing its relation to her work) sufficiently show that her anxiety substantially impaired her ability to work, making her a disabled individual under the ADA.

However, Plaintiff cannot make out a prima facie case because she has failed to show that her termination occurred as a result of discrimination. Plaintiff admits that she never informed Dr. Graves what her medical conditions were, and that he, like Mr. Farero, never learned why she requested FMLA leave (SOF ¶¶ 47-49). Dr. Graves signed FMLA paperwork in which Plaintiff checked off a box for a "Serious health condition," but she has not provided any record evidence suggesting disability discrimination, or creating any causal connection whatsoever, beyond her own suppositions, between either her ailments (or her decision to take FMLA leave) and her termination. Plaintiff's ADA claim therefore fails.

### E. Timeliness

Defendants also assert that Plaintiff's federal claims were untimely. (Mem. in Support of Def.'s Mot for Summ. J. at 54-56, ECF 85-2). Because she also asserted state-law claims to which this argument would not pertain and Defendant is entitled to summary judgment on all counts, the Court does not reach this issue.

### F. Plaintiff's 56(d)(2) Motion

Rule 56(d)(2) allows the Court to provide additional time for discovery if a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Plaintiff's 56(d)(2) motion (ECF 99) consists only of recycled arguments for being allowed to take the deposition of Vincent Price, the former university provost, which have previously been rejected. (Order denying discovery, ECF 67). Plaintiff asserted that she has been denied discovery that would allow her to prove the "nexus" of her claims, and speculated in the affidavit accompanying the 56(d)(2), as she has before, that "there is no question that Price discussed Plaintiff with Kinane, directly or indirectly, and Kinane knew that Heit was a 'problem' that he needed to remove and retaliate against." (Heit Aff., Ex. A. to Pl.'s Emergency Mot. for Discovery, ECF 99). Not only has Plaintiff presented nothing new in this motion, but she has ignored both the deposition testimony of Dean Kinane stating that he was unaware that Plaintiff had made complaints about his behavior, and the declaration submitted by former provost Price denying all knowledge of Plaintiff or the circumstances surrounding her termination. (Kinane Dep. 49:19-50:8; Price Decl., ECF 65-1). Plaintiff's 56(d)(2) motion is therefore denied.

### VI. Conclusion

Defendant's motion for summary judgement is hereby **GRANTED**. Plaintiff's motion for relief pursuant to Rule 56(d)(2) is **DENIED**. An appropriate order follows.

O:\CIVIL 16\16-2929 Heit v Penn Dental\16cv2929 Heit MSJ Memo.docx